IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOSHUA B.[1],

      **Plaintiff,**

v.

      Civil Action 1:22-cv-68
      Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Joshua B., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income.  This matter is before the Court for disposition based upon Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 10), Plaintiff's Reply (ECF No. 11), and the administrative record (ECF No. 8).  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.   BACKGROUND**

Plaintiff protectively filed his applications for benefits on September 4, 2019, alleging that he has been disabled since November 23, 2018, due to epilepsy.  (R. at 186-92, 193-99, 235.)  Plaintiff's application was denied initially in November 2019 and upon reconsideration in

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

August 2020. (R. at 77-118, 123-30.) Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). (R. at 131-47.) ALJ Patrick J. MacLean held a telephone hearing on December 1, 2020, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 27-76.) A vocational expert ("VE") also appeared and testified. (*Id.*) On January 19, 2021, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 12-26.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-8.)

## II. RELEVANT RECORD EVIDENCE

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's relevant hearing testimony as follows:

> [Plaintiff] alleges disability due to a seizure disorder. He testified that he experiences both grand mal and focal seizures. He said the seizures occur about once per month. [Plaintiff] said [these] seizures are triggered by fast movement and stress. [Plaintiff] reported that his antiseizure medications cause memory loss and drowsiness. [Plaintiff] estimated that he could pay attention for thirty to forty minutes. [Plaintiff] stated that he lives with his mother, his fiancé, and three children. [Plaintiff] said he provides some care to the youngest child, a four-year-old. [Plaintiff] reported that his mother is ill with cancer and heart disease, and that in the past few months, he has helped her with activities such as getting up from her chair and taking medication. [Plaintiff] acknowledged a history of alcohol use, but said he had been sober since November 2018.

(R. at 19.)

### B. Relevant Medical Records

The ALJ summarized the relevant medical records as follows:

[Plaintiff] began experiencing seizures in July 2018. He present[ed to] a hospital emergency department (ED) after an episode of jerking and shaking (Exhibit 1F, p.17). Head CT was negative and he was sent home after receiving fluids. [Plaintiff] returned to the ED later that day after experiencing another episode during which his wife said he started into space for ten to fifteen seconds, then experienced tonic-clonic jerking lasting a minute or two. It was noted at this second visit that [Plaintiff] had been drinking heavily the night before. Brain MRI and EEG were normal. Diagnoses were seizure-like activity, loss of consciousness, and hypocalcemia. Keppra was prescribed. [Plaintiff] followed up two weeks later, and said he had stopped taking Keppra because it made him feel like a zombie (Id., p.15).

The records reflects post-seizure ED visits in November 2018 (Exhibit 4F, p.32); January 2019 (Exhibit 1F, p.8); November 2019 (Exhibit 6F, p.3); May 2020 (Exhibit 11F, p.67); and October 2020 (Id., p.1). At his November 2018 visit, [Plaintiff] said he had not been taking Keppra, and was not sure if he was supposed to be taking it (Id., p.33).

[Plaintiff] consulted with a neurologist in December 2018 (Exhibit 4F, p.29). He reported that he experienced seizures in July and November. He said he stopped his anti-seizure medication after two weeks because it made him feel suicidal. An EEG was ordered, and [Plaintiff] was started on a new anti-seizure medication.

In February 2019, [Plaintiff] told his neurologist that his mood had been good since he started lamotrigine, and that he had not had any seizures since his last visit in January (Exhibit 4F, p.26). [Plaintiff] was instructed to take his medication as prescribed and observe seizure precautions.

[Plaintiff]'s March 2019 EEG did not note any interictal epileptiform discharges (Exhibit 4F, p.39).

[Plaintiff]'s April 2019 brain MRI was negative (Exhibit 10F).

In May 2019, [Plaintiff] told his neurologist that he had experienced one "aura" seizure and one "full blown" seizure since his last visit (Exhibit 4F, p.11). He was instructed to divide his medication dose and take it twice per day. In June, [Plaintiff] said he had experienced an episode lasting five to six minutes, not a "full blown" episode, at work and was sent home (Id., p.7). In September, [Plaintiff] said he had experienced two episodes since his last visit (Id., p.4). He said his wife was able to talk him out of the first one, and he did not have a whole seizure, but he did have a full seizure on another occasion and lost complete awareness. [Plaintiff]'s oxcarbazepine dose was increased and a 72-hour ambulatory EEG was ordered.

> [Plaintiff] established care with a new neurologist on three occasions in November 2019. At the first visit, he reported that he experienced seizures about every month, around the 13th of the month (Exhibit 5F, p.3). Neurological exam was normal. New lab work was ordered. [Plaintiff] was again instructed to have a 72-hour EEG. Diagnosis was epilepsy. At his next visit later that month, the notes indicate that [Plaintiff] reported visual changes, dizziness, confusion, poor concentration, and depression (Exhibit 7F, p.7). However, it was noted elsewhere in the report that [Plaintiff] denied lightheadedness, tiredness, and depression. [Plaintiff] said he was experiencing seizures about three times per month. [Plaintiff] said his medications had not worked to reduce the frequency of his episodes, but that if he missed a dose, he was more likely to have breakthrough activity. Lab work was ordered, and [Plaintiff] was directed to continue seizure precautions and obtain a 72-hour EEG.
>
> [Plaintiff]'s December 2019 72-hour EEG was normal, with no focal slowing or epileptiform discharges (Exhibit 7F, p.5).
>
> In February 2020, [Plaintiff] told his neurologist that he had not had any "violent spells," but had numerous auras (Exhibit 7F, p2). He said these episodes averaged about two per month, and that he felt an odd sensation at the time, and felt like he was in a different dimension. He said he was confused and tired afterward. [Plaintiff] opined that stress was a trigger, as the episodes often occurred when he was busy at work and moving a lot. It was noted that the addition of Onfi had been helpful, but that [Plaintiff] was still having relatively frequent episodes described as auras. It was noted that a hospital stay was considered but that there was a concern that an episode would not be captured. [Plaintiff] was referred for consideration of a vagal nerve stimulator versus change in medication.
>
> In April 2020, [Plaintiff] told his neurologist that he experienced a sudden burst of anxiety while doing dishes, then began having an aura, and woke up on the floor (Exhibit 9F). He said he then had a violent seizure. [Plaintiff] said he had been taking his oxcarbazepine and lamictal, but had run out of clobazam two weeks earlier. It was noted that [Plaintiff] had scheduled an appointment with an epileptologist.
>
> In September 2020, [Plaintiff] said he had experienced one "violent" and two "lesser" seizures since his April 2020 visit. He said he had not seen the epileptologist due to COVID. [Plaintiff]'s medications were adjusted, due to a rash. A hospital stay was again discussed, but [Plaintiff] said he wanted to try the new medications first.

(R. at 19-21.)

### III. ADMINISTRATIVE DECISION

On January 19, 2021, the ALJ issued his decision. (R. at 12-26.) The ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2024. (R. at 17.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 23, 2018, the alleged onset date. (*Id.*) The ALJ found that Plaintiff has the severe impairments of epilepsy and a seizure disorder. (R. at 18.) The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: [Plaintiff] cannot climb ladders, ropes, or scaffolds. He can frequently climb ramps/stairs and balance.

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> [Plaintiff] must avoid concentrated use of hazardous moving machinery and exposure to unprotected heights. [Plaintiff] cannot engage in commercial driving. Due to physical symptoms and potential medication side effects, [Plaintiff] is limited to simple, routine, and repetitive tasks that can be learned on the job in 30 days or less, that are free of fast-paced production requirements, involving only simple work-related decisions and few if any workplace changes.

(R. at 18-19.)

At step four of the sequential process, the ALJ determined that Plaintiff is capable of performing his past relevant work as a break man. According to the ALJ, this work does not require the performance of work-related activities precluded by his RFC. (R. at 22.) He therefore concluded that Plaintiff has not been disabled since November 23, 2018. (*Id.*)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices the claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

V. ANALYSIS

Plaintiff contends that the ALJ erred in his evaluation of both the treating neurologist's assessment and, by extension, the VE's testimony.  (ECF Nos. 9 and 11.)  According to Plaintiff, although the ALJ found Dr. Dula's assessment persuasive, he disregarded the portions of the assessment indicating that Plaintiff's seizures were not well controlled and that, after prescribed treatment, Plaintiff experienced three to four seizures per month during the day.  This is significant, Plaintiff explains, because the vocational expert testified that employers will not tolerate even one unexcused absence on an ongoing basis.  (ECF No. 9 citing R. 74.)  Plaintiff asserts that the ALJ was required to reconcile Dr. Dula's assessment with this portion of the VE's testimony.  The Court disagrees and finds that the ALJ's decision is supported by substantial evidence.

As a preliminary matter, a claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must assess a claimant's RFC based on all of the relevant evidence in a claimant's case file. *Id*. Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *see* 20 C.F.R. §§ 404.1513(a), 404.1520c. These regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). Objective medical evidence is defined as "medical signs, laboratory findings, or both." 20 C.F.R. §§ 404.1513(a)(1); 416.913(a)(1). "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. §§ 404.1513(a)(3); 416.913(a)(3). "Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim." 20 C.F.R. §§ 404.1513(a)(4); 416.913(a)(4). "Medical opinion" and "prior administrative medical finding" are defined as follows:

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions....
>
> > (i)  (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions

> > (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> > (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> > (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> > (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes....
> > * * *
>
> (5) Prior administrative medical finding. A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as:
>
> > > (i)   The existence and severity of your impairment(s);
> > >
> > > (ii)  The existence and severity of your symptoms;
> > >
> > > (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;....(v)...your residual functional capacity;
> > >
> > > (vi)  Whether your impairment(s) meets the duration requirement; and
> > >
> > > (vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.

20 C.F.R. §§ 404.1513(a)(2)(i), (5); 416.913(a)(2)(i), (5).

The governing regulations include a section entitled "[h]ow we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27,

9

2017." 20 C.F.R. §§ 404.1520c; 416.920c. These regulations provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, they provide that an ALJ will consider medical source opinions and prior administrative findings using five factors: supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

The regulations explicitly indicate that the "most important factors" to consider are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2).  Indeed, the regulations *require* an ALJ to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in a benefits determination or decision and allows that the ALJ "may, but [is] not required to, explain how [they] considered" the other factors. *Id.* If, however, two or more medical opinions or prior administrative medical findings are equal in supportability and consistency "but are not exactly the same," an ALJ must also articulate the other most persuasive factors. 20 C.F.R. §§ 404.1520c(b)(3); 416.920c(b)(3). In addition, when medical sources provide multiple opinions or multiple prior administrative findings, an ALJ is not required to articulate how he evaluated each opinion or finding individually but must instead articulate how he considered the opinions or findings from that source in a single analysis using the five factors described above. 20 C.F.R. §§ 404.1520c(b)(1); 416.920c(b)(1). Finally, the regulations explain that the SSA is not required to

articulate how it considered evidence from non-medical sources. 20 C.F.R. §§ 404.1520c(d); 416.920c(d).

The applicable regulations provide the following guidance for how ALJs should evaluate the "supportability" and "consistency" of medical source opinions and prior administrative findings:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2); 416.920c(c)(1)-(2). In practice, this means that the "supportability" factor "concerns an opinion's reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021) (citing SSR 96-2p, 1996 SSR LEXIS 9 (July 2, 1996) (explaining supportability and inconsistency); 20 C.F.R. § 404.1527(c)(3), (4) (differentiating "supportability" and "consistency"); 20 C.F.R. § 404.1520c(c)(1), (2) (further clarifying the difference between "supportability" and "consistency" for purposes of the post-March 27, 2017 regulations)).

The ALJ had this to say about Dr. Dula's assessment:

> Neurologist Drew Dula, D.O. completed a statement sometime after February 2020, as it was noted that was the last time he saw the claimant (Exhibit 8F). Dr. Dula answered "no" to the question of whether [Plaintiff]'s seizures were controlled, noting that [Plaintiff] reported seizure activity occurring three to four times per month. However, it was noted that he was still in the phase of dosing medications to appropriate therapeutic dose. It was noted that [Plaintiff] was on three months of seizures precautions, and had been directed not to drive, swim, climb ladders, bathe in a tub unattended, or operate heavy machinery.

(R. at 21.) The ALJ then found the assessment persuasive, but specifically limited this finding to "seizure precautions" because it was "consistent with a history of seizures." (*Id*.) Accordingly, the ALJ incorporated into the RFC the opined limitations relating to Plaintiff's ability to climb, drive, or operate heavy machinery.

Plaintiff contends his seizures would cause his absence from work three to four times each month. Plaintiff maintains that Dr. Dula's assessment confirms this frequency of absence. Read fairly, however, the assessment does not. Indeed, the assessment does not suggest, let alone establish, that Plaintiff would need to be absent from work with such frequency. At most, Dr. Dula noted Plaintiff's self-reports of 3 to 4 seizure episodes per month. (R. at 465.) Beyond that, Dr. Dula stated only that "Plaintiff does have altered awareness for about 5-10 minutes after seizure episodes." (R. at 464.) This statement also appears to be based solely on Plaintiff's self-reports because immediately following this description, Dr. Dula noted that neither he nor his staff had witnessed Plaintiff's seizures. (*Id*.) Thus, Dr. Dula's medical opinion cannot reasonably be viewed as objective medical evidence establishing Plaintiff's consistent absence from work three to four times per month due to his seizures. In short, the assumption underlying Plaintiff's sole challenge here is not supported by the record. Accordingly, the ALJ did not err in failing to reconcile such claimed absences with the VE testimony. *See generally McGrew v.*

*Berryhill*, No. 3:16-CV-220, 2017 WL 4324765, at *8 (S.D. Ohio Sept. 29, 2017) (finding no error where ALJ gave less weight to physician's opinion because it was, "at best, speculative and primarily based on [Plaintiff's] subjective allegations.") (citation omitted); *Wagers v. Comm'r of Soc. Sec.*, No. 1:15-CV-312, 2016 WL 4211811, at *7 (S.D. Ohio 2016) (finding that ALJ should not be penalized for failing to discuss her reasons for rejecting one discrete portion of medical opinion that offered a wholly speculative, unsupported and vague "estimate" that Plaintiff would be absent from work more than 3-4 days per month), *report and recommendation adopted*, 2016 WL 4194504 (S.D. Ohio Aug. 9, 2016).

Moreover, the ALJ's findings are supported by substantial evidence. As set forth above, the ALJ provided a detailed summary of Plaintiff's medical records and treatment history as they relate to his seizure disorder. The ALJ acknowledged many of Plaintiff's subjective reports of seizure episodes. (R. at 19-21.) Plaintiff does not challenge this recitation. Additionally, the ALJ is not required to accept Plaintiff's subjective complaints, and may discount them when the ALJ deems them inconsistent with the objective medical and other evidence. *Stark v. Comm'r of Soc. Sec.*, No. 1:20-CV-02009-BYP, 2021 WL 8015626, at *9 (N.D. Ohio Dec. 21, 2021), *report and recommendation adopted sub nom. Stark v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-2009, 2022 WL 610763 (N.D. Ohio Mar. 1, 2022) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003)). That is what the ALJ did here. Against the medical evidence of record, much of it Plaintiff's self-reports, the ALJ weighed other record evidence that all testing had been negative and Plaintiff had been able to work part time during most of his alleged disability period. (R. at 22.) Nevertheless, the ALJ accounted for Plaintiff's seizure disorder by including

restrictions in the RFC related to climbing, driving, and operating hazardous machinery. "An administrative law judge is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Notably, in deference to Plaintiff's seizure history, the ALJ also included limitations as to climbing ramps/stairs and balancing. In doing so with respect to these exertional limitations, the ALJ went beyond the opinions of the state agency medical consultants. In Plaintiff's view however, this was not enough. But Plaintiff has not shown that the evidence before the ALJ required the inclusion of any greater limitations.

At best, Plaintiff's argument regarding the ALJ's treatment of Dr. Dula's assessment suggests that the ALJ should have weighed the evidence differently. The law in the Sixth Circuit is clear that a court cannot reweigh evidence considered by the ALJ. Consequently, the Court declines to do so here. *See Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013) (internal quotations and citations omitted) ("Here, the [plaintiff] asks us to reweigh the evidence and substitute our judgment for that of the ALJ. We cannot do so. Even if we would have taken a different view of the evidence were we the trier of facts, we must affirm the ALJ's reasonable interpretation."). Even if there is substantial evidence or indeed a preponderance of the evidence to support a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). Here, the ALJ's findings are supported by substantial evidence within his "zone of choice." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th

14

Cir. 1994). Accordingly, substantial evidence supports the ALJ's RFC and the ALJ did not err by failing to reconcile Plaintiff's claimed absence frequency with the VE testimony.

## VI. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, Plaintiff's Statement of Errors (ECF No. 9) is **OVERRULED** and the Commissioner's decision is **AFFIRMED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**Date:** **September 8, 2022**         /s/ *Elizabeth A. Preston Deavers*
**ELIZABETH A. PRESTON DEAVERS**
**UNITED STATES MAGISTRATE JUDGE**